RICKY L. SHURTS AND EAGLE HILLS EXCAVATING, INC., APPELLANTS, v. JESSICA E. FLYNN AND DEBORAH M. HEINSSEN, APPELLEES.

707 N.W.2d 37

Filed December 13, 2005.   No. A-04-240.

E. Terry Sibbernsen, Mandy L. Strigenz, and Andrew D. Sibbernsen, of Sibbernsen & Strigenz, P.C., and Richard B. Maher for appellants.

Betty L. Egan and Kylie A. Wolf, of Walentine, O'Toole, McQuillan & Gordon, for appellee Jessica E. Flynn.

Donald D. Schneider, P.C., for appellee Deborah M. Heinssen.

SIEVERS, CARLSON, and CASSEL, Judges.

CARLSON, Judge.

## INTRODUCTION

In this motor vehicle accident case, Ricky L. Shurts and Eagle Hills Excavating, Inc. (collectively the appellants), appeal from a judgment of the district court for Washington County granting Deborah M. Heinssen a directed verdict and entering the jury's verdict in favor of Jessica E. Flynn. For the reasons set forth below, we reverse, and remand for a new trial on the issue of damages in regard to Flynn, and affirm the directed verdict in favor of Heinssen.

## BACKGROUND

On October 23, 2002, the appellants filed a second amended petition against Flynn and Heinssen, alleging that on April 27,

2000, Flynn's vehicle rear-ended Heinssen's vehicle, causing Heinssen's vehicle to travel into Shurts' lane of traffic and collide into the side of his vehicle. Specifically, the second amended petition alleged that on April 27 at approximately 8:55 p.m., Shurts was operating a semi-trailer truck, owned by Eagle Hills Excavating, in a northerly direction on U.S. Highway 30 in Blair, Nebraska, when a vehicle operated by Flynn, which was traveling south on Highway 30, struck the rear of a vehicle operated by Heinssen, which was also traveling south on Highway 30. At that time, Heinssen's vehicle crossed the centerline and struck Shurts' vehicle on the driver's side, causing bodily injury and property damage to Shurts.

Flynn admitted that her negligence was the proximate cause of the accident, but denied the nature and extent of Shurts' injuries. Heinssen denied that she was at fault in the accident.

A jury trial took place on December 17 through 19, 2003. Shurts testified that he owns Eagle Hills Excavating and that he works as an excavating demolition contractor. He testified that at the time of the accident, he was driving a "semi-truck" attached to a flatbed trailer that was carrying a piece of heavy equipment. Shurts testified that as he was traveling north on Highway 30, a two-lane highway, he saw Heinssen's vehicle, which was traveling south, and he initially thought Heinssen was going to make a left turn in front of him. He testified that he did not think there was enough time for Heinssen to safely turn in front of him, so he slowed down and moved his truck to the right toward the shoulder of the road. He testified that he then observed Heinssen's vehicle come to an abrupt stop, as if Heinssen had changed her mind about turning in front of him and had decided to wait. He testified that when she stopped, her vehicle was approximately 6 inches across the centerline that separates the two lanes of traffic. Shurts testified that he did not know whether Heinssen had her headlights on or whether she had her left turn signal on.

Shurts testified that when Heinssen's vehicle collided with his truck, he felt a sudden jolt. He testified that when he woke up the morning after the accident, the back of his neck was stiff and sore and he had a headache. He testified that before the accident, he had never experienced any neck pain. He testified

that the pain in his neck and the headache continued for several days. On the fourth day after the accident, he could not turn his head and his headache was severe, so he made an appointment with his family physician. Shurts testified he saw his physician on May 3, 2000, and complained that he could not turn his head, that he had pain in the back of his neck and into his shoulders, and that he had a persistent headache. He returned to his physician's office on May 12 with the same symptoms. Shurts testified that on May 18, he started seeing Dr. David W. Hoffman, a chiropractor, and continued treating with him until August 1. Shurts testified that during that time, he continued to have neck pain and severe headaches.

Shurts testified that in March 2001, he went to see Dr. Huy D. Trinh, an orthopedic surgeon who specialized in spinal disorders, including neck problems. Shurts testified that at that time, he was still suffering from pain in his neck and headaches. Shurts testified that Trinh recommended physical therapy for him, but that he did not attend physical therapy because he could not afford it. Shurts testified that he saw Trinh a second time in March 2002, a year after the first visit, and that the same symptoms were still persisting. Shurts further testified that in the year before trial, there had not been a day that he had not had some pain in his neck. He testified that he had days when the pain in his neck was milder and other days when the pain was more severe. He also testified that there were days when his headache was not severe. Shurts presented an exhibit claiming that he had incurred medical expenses in the amount of $2,502.87, as a result of the accident.

Flynn's deposition was read into the record, because she was not present at trial. She testified that at the time of the accident, she was traveling south on Highway 30, it was dark outside, and she had her vehicle's headlights on. Flynn testified that she saw Heinssen's vehicle for the first time just a few seconds before the accident, when Flynn "looked up." Flynn testified that she saw the brakelights illuminated on Heinssen's vehicle, but that she did not know whether Heinssen's vehicle was completely stopped or not. Flynn testified that when she saw Heinssen's vehicle, Flynn stepped on her brakes and turned her wheel to the right. She testified that the front driver's side of her vehicle rear-ended

Heinssen's vehicle. Flynn testified that she did not know why she did not see Heinssen's vehicle sooner than she did. She testified that her "mind must have been elsewhere."

Flynn testified that she did not know whether Heinssen did anything that caused or contributed to the accident. Flynn also testified that she did not know whether Heinssen stopped abruptly, whether Heinssen's vehicle had its left turn signal on, or whether Heinssen's vehicle had its headlights on. Flynn further testified that she did not know whether Heinssen's vehicle was over the centerline before the accident.

Heinssen testified that just before the accident, she was traveling south on Highway 30 and came to a complete stop, intending to make a left turn. She testified that she had her vehicle's headlights on and left turn signal on. Heinssen testified that she saw oncoming headlights from traffic traveling northbound, so she stopped and was waiting for northbound traffic to clear before making her left turn. She testified that she came to a gradual stop and not an abrupt stop. She testified that while she was stopped, she looked in her rearview mirror and saw Flynn's vehicle coming up behind her and it appeared that Flynn was not going to stop. Heinssen testified that Flynn's vehicle then struck the right rear end of her vehicle. Heinssen testified that she had been stopped for 5 to 10 seconds before the impact occurred and that she saw Flynn's vehicle in her rearview mirror just a few seconds before impact. Heinssen testified that before Flynn rear-ended her, the front wheels of Heinssen's vehicle were positioned straight ahead and her vehicle was "straight with the lane" and was not over the centerline. Heinssen testified that after the impact with Flynn's vehicle, Heinssen's vehicle went into the northbound lane of traffic and the left front end of her vehicle struck the driver's side of Shurts' vehicle.

Lori Wheaton, a witness to the accident, also testified. Wheaton testified that just before the accident, she was driving northbound on Highway 30 and was two to three car lengths behind Shurts' vehicle. She testified that she saw Heinssen's vehicle stopped in the southbound lane, as if Heinssen was waiting to turn left. Wheaton testified that she observed Heinssen's vehicle stopped for a few seconds before the accident and that Heinssen's vehicle was positioned in its own lane and was not

over the centerline. Wheaton testified that Heinssen's vehicle had its headlights on and that Wheaton was "95 percent sure" that Heinssen's vehicle had its left turn signal on. Wheaton further testified that she observed Flynn's vehicle coming up behind Heinssen's vehicle and saw that it was not slowing down. Wheaton testified that there was not anything Heinssen could have done to prevent the accident. Wheaton further testified that following the accident, Flynn repeatedly said, " 'I didn't see [Heinssen]. I did not see her stop.' "

Hoffman testified that he provided Shurts with chiropractic care from May 18 to August 1, 2000, and treated him 11 times during this period. He testified that at Shurts' first visit, Shurts complained of low-neck pain, with the pain radiating into his shoulders, and also complained of headaches. Hoffman testified that Shurts told him that following the automobile accident on April 27, 2000, Shurts initially had some discomfort in his neck and shoulders which gradually got worse and led him to seek medical attention. Hoffman testified that based on his examination of Shurts and the history that Shurts provided, he diagnosed Shurts with "cervical sprain/strain — acute/severe which is complicated by cervical somatic dysfunction." Hoffman explained that "cervical somatic dysfunction" basically means that a bone in the neck is out of place, causing swelling and putting tension on the tissues in the area, thereby causing pain. Hoffman further testified that he secondarily diagnosed Shurts with having a thoracic sprain/strain, which is a sprain/strain in the area just below the neck. Hoffman testified that it was his opinion within a reasonable degree of chiropractic certainty that the cervical sprain/strain, complicated by cervical somatic dysfunction, and the thoracic sprain/strain were caused by the automobile accident on April 27, 2000.

Hoffman testified that during the time he treated Shurts, Hoffman's diagnosis of Shurts remained the same throughout the treatment and Shurts continued to be in pain. Hoffman testified that Shurts stopped treating with him after August 1, 2000, despite Hoffman's recommendation that Shurts continue treating with him.

Trinh's video deposition was played for the jury. Trinh testified that Shurts was referred to him by Shurts' family physician.

Trinh testified that he saw Shurts on three occasions, the first being in March 2001. Trinh testified that on that date, Shurts indicated that he had been in an automobile accident on April 27, 2000, and that about 4 days after the accident, he began having pain and stiffness in his neck, as well as headaches. Trinh testified that Shurts indicated he was still having these problems at the March 2001 visit. Trinh testified that Shurts did not indicate that he had any neck problems before the accident.

Trinh testified that Shurts' MRI showed degenerative disk disease, or "discarthrosis," involving three disks in Shurts' neck. Trinh explained that discarthrosis is an aging condition of the spine. He further explained that the disk or disks become degenerated, meaning they lose water content and become "more crumbly [and] a lot of time[s] bulge out." He testified that this condition is often due to age or the amount of physical work a person does. Trinh testified that Shurts' condition developed over a period of years.

Trinh diagnosed Shurts as suffering from chronic neck pain with related headaches and gave him a secondary diagnosis of discarthrosis in three disks in his neck. Trinh testified that Shurts' discarthrosis was a preexisting condition that was aggravated by the accident. Trinh explained that a person can have this degenerative condition without any symptoms, i.e., not experience any pain, until some type of traumatic event irritates the area and triggers symptoms. Trinh testified that in Shurts' case, Trinh assumed there was some violent movement of the neck or head during the accident that irritated the degenerated area and triggered Shurts' symptoms.

Trinh testified that he saw Shurts for the second time in March 2002 and that Shurts still complained of neck pain and headaches. Trinh testified that his diagnosis of Shurts remained the same and that Shurts' preexisting discarthrosis, which was aggravated by the accident, was still causing his pain.

Trinh testified that he saw Shurts for the third time on September 8, 2003. Trinh testified that Shurts continued to complain of neck pain and that upon examination, Trinh determined that Shurts' condition remained about the same. Trinh testified that his diagnosis of Shurts also remained the same—

chronic neck pain and discarthrosis in three disks in the neck, aggravated by the April 27, 2000, accident.

Trinh testified that it was his opinion, within a reasonable degree of medical certainty, that the accident on April 27, 2000, aggravated Shurts' preexisting discarthrosis, which in turn caused Shurts' neck pain; that Shurts' chronic neck pain and related headaches were caused by the accident; and that Shurts experienced a permanent disability as a result of the aggravation of his preexisting discarthrosis.

At the close of the appellants' evidence, Heinssen moved for a directed verdict, which the trial court granted, and Heinssen was dismissed from the case. Subsequently, the jury returned a verdict in favor of Flynn. Pursuant to the jury verdict, the trial court entered a judgment in favor of Flynn. Thereafter, the appellants filed a motion for new trial and motion for judgment notwithstanding the verdict. The trial court overruled the motions, and the appellants now appeal.

## ASSIGNMENTS OF ERROR

The appellants assign that the trial court erred in failing to give their proposed jury instruction regarding preexisting conditions and in directing a verdict in favor of Heinssen.

## STANDARD OF REVIEW

Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party. *Jay v. Moog Automotive*, 264 Neb. 875, 652 N.W.2d 872 (2002); *Smith v. Fire Ins. Exch. of Los Angeles*, 261 Neb. 857, 626 N.W.2d 534 (2001).

To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction. *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005); *Curry v. Lewis & Clark NRD*, 267 Neb. 857, 678 N.W.2d 95 (2004).

A jury instruction that misstates the burden of proof has a tendency to mislead the jury and is erroneous. *Pribil v. Koinzan*,

266 Neb. 222, 665 N.W.2d 567 (2003); *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996).

■ In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Livingston v. Metropolitan Util. Dist.*, 269 Neb. 301, 692 N.W.2d 475 (2005); *Saberzadeh v. Shaw*, 266 Neb. 196, 663 N.W.2d 612 (2003).

■ A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, when an issue should be decided as a matter of law. *Livingston v. Metropolitan Util. Dist., supra*; *Williams v. Allstate Indemnity Co.*, 266 Neb. 794, 669 N.W.2d 455 (2003).

## ANALYSIS

*Jury Instruction.*

The appellants assign that the trial court erred in failing to give their proposed jury instruction regarding preexisting conditions. Regarding Shurts' preexisting condition, the trial court specifically instructed the jury in jury instruction No. 14: "There is evidence that [Shurts] had a neck condition prior to the accident on April 27, 2000. [Flynn] is liable only for any damages that you find to be proximately caused by the accident." The trial court refused to give the appellants' proposed jury instruction, which stated:

> There is evidence that [Shurts] had a neck condition prior to the accident on April 27, 2000. [Flynn] is liable for any damages you find to be proximately caused by the accident.
>
> If you cannot separate damages caused by the preexisting condition from those caused by the accident, then [Flynn] is liable for all of those damages.

To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law,

(2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction. *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005); *Curry v. Lewis & Clark NRD*, 267 Neb. 857, 678 N.W.2d 95 (2004).

In *Ketteler v. Daniel*, 251 Neb. 287, 556 N.W.2d 623 (1996), the Nebraska Supreme Court addressed a case similar to the one at hand. In *Ketteler*, the trial court gave the following instruction: " 'There is evidence that the plaintiff had a neck, back and hip condition prior to the accident of April 26, 1991. The defendant is liable only for any damage that you find to be proximately caused by the accident of April 26, 1991.' " 251 Neb. at 295, 556 N.W.2d at 629.

The trial court in *Ketteler* did not give the following instruction, which the plaintiff had requested:

> "There is evidence that [the plaintiff] had a pre-existing neck and back condition prior to the date of this collision. The Defendant is liable only for any damages that you find to be proximately caused by the collision of April 26, 1991.
>
> "If you cannot separate damages caused by the pre-existing condition from those caused by the accident, then the Defendant is liable for all of those damages.
>
> "The Defendant may be liable for bodily harm to [the plaintiff] even though the injury is greater than usual due to the physical condition which predisposed [the plaintiff] to the injury. In short, the Defendant takes the Plaintiff as he finds her."

251 Neb. at 295-96, 556 N.W.2d at 629.

Relying on *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996), the Nebraska Supreme Court in *Ketteler* concluded that the trial court's failure to give the plaintiff's proposed instruction was reversible error. Therefore, the Supreme Court reversed, and remanded for a new trial.

*David v. DeLeon, supra,* involved an automobile accident case in which the jury returned a verdict for the plaintiff. Prior to the accident, the plaintiff suffered from arthritis in his back and knees. The defendant proposed a jury instruction which stated:

> "There is evidence that the plaintiff had degenerative disc disease of the cervical spine (also called spondylosis),

spinal stenosis of the lumbar spine, and degenerative arthritic changes in the knees prior to the date of the accident. The defendant is liable only for any damages that you find to be proximately caused by the accident."

*Id.* at 113, 547 N.W.2d at 729.

The trial court in *David* rejected the defendant's instruction and instead submitted the plaintiff's proposed instruction:

"There is evidence that the plaintiff had pre-existing back and joint conditions prior to the date of the accident. The defendant is liable only for any damages found to be proximately caused by the accident.

"If you cannot separate damages caused by the pre-existing conditions from those caused by the accident, then the defendant is liable for all of those damages."

*Id.*

On appeal, the defendant in *David* argued that the portion of the instruction stating that if the jury could not separate damages, then the defendant was liable for all damages should not have been given. The Nebraska Supreme Court affirmed.

In rejecting the defendant's argument, the Nebraska Supreme Court in *David* relied on *McCall v. Weeks*, 183 Neb. 743, 164 N.W.2d 206 (1969), which "adopted the theory of the 'eggshell-skull' plaintiff, whom the negligent defendant must take as he finds." 250 Neb. at 114, 547 N.W.2d at 729. The Supreme Court in *McCall* held that a person injured as a result of another person's negligent acts is entitled to recover all damages which proximately resulted from those acts, including damages resulting from aggravation of a preexisting condition. In *David*, the Supreme Court found that the ruling in *McCall* justified the trial court's decision to issue its instruction.

The Nebraska Supreme Court in *David* further stated:

[A] plaintiff is not . . . required to provide a precise line between the damages directly related to the accident and any preexisting physical or mental condition the defendant can exhume as a precondition for recovering any damages at all. . . . Once the plaintiff presents evidence from which a jury reasonably can find that damages were proximately caused by the tortious act, the burden of apportioning damages resulting from the tort rests squarely on the defendant.

. . . .

In the instant case, without the admonition that the defendant is liable for all damages if the jury cannot apportion, the instruction would have failed to address the event in which a jury finds that damages were proximately caused by a collision, but is unable to determine precisely what quantum of those damages was not preexisting. This instruction prevents the result of a jury finding that damages were proximately caused by the tortious act, but failing to award damages because it cannot demarcate preexisting illnesses from new losses.

250 Neb. at 115-16, 547 N.W.2d at 730.

Based on the above case law, we conclude that the appellants' proffered instruction should have been submitted to the jury. The appellants' adduced evidence that the accident proximately caused an aggravation of a preexisting condition. Specifically, Trinh testified that Shurts had a preexisting condition, known as discarthrosis, in three disks in his neck. Trinh testified that Shurts' preexisting discarthrosis was aggravated by the April 27, 2000, accident and that such aggravation caused Shurts' neck pain and related headaches. The burden of apportioning damages then rested squarely with Flynn. The trial court's instruction to the jury did not reflect this fact. A jury instruction that misstates the burden of proof has a tendency to mislead the jury and is erroneous. *Pribil v. Koinzan*, 266 Neb. 222, 665 N.W.2d 567 (2003); *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996). As the Nebraska Supreme Court stated in *David*, without the admonition that Flynn is liable for all damages if the jury cannot apportion, the instruction fails to address the event in which the jury finds that damages were proximately caused by the collision, but is unable to determine precisely what quantum of those damages was not preexisting.

Accordingly, the trial court's refusal to give the appellants' requested instruction is reversible error. First, the proffered instruction correctly stated the law. Second, the instruction was warranted by the evidence, based on the testimony of Trinh. Finally, refusal by the trial court to submit the proposed instruction was prejudicial to the appellants. Thus, we reverse, and remand for a new trial on the issue of damages.

*Directed Verdict.*

The appellants next assign that the trial court erred in granting Heinssen's motion for directed verdict. The appellants argue that the directed verdict should not have been granted, because there was evidence of negligence on Heinssen's part which was a proximate cause of the accident. We disagree.

A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, when an issue should be decided as a matter of law. *Livingston v. Metropolitan Util. Dist.*, 269 Neb. 301, 692 N.W.2d 475 (2005); *Williams v. Allstate Indemnity Co.*, 266 Neb. 794, 669 N.W.2d 455 (2003).

The appellants specifically point to Shurts' testimony that Heinssen came to an abrupt stop and that her vehicle was resting approximately 6 inches over the centerline that separates the two lanes of traffic. While there is evidence that contradicts Shurts' testimony, in reviewing a directed verdict, we must resolve every controverted fact in the appellants' favor. See, *Livingston v. Metropolitan Util. Dist., supra*; *Saberzadeh v. Shaw*, 266 Neb. 196, 663 N.W.2d 612 (2003).

Assuming Heinssen did come to an abrupt stop, there is no evidence that Flynn rear-ended Heinssen as a result of Heinssen's quick stop. Flynn testified that she did not know why she did not see Heinssen's vehicle sooner than she did and that her "mind must have been elsewhere." The evidence is undisputed that Heinssen's vehicle was stopped at the time she was rear-ended by Flynn. The evidence indicates that Flynn would have rear-ended Heinssen whether Heinssen came to a gradual stop or an abrupt stop, because Flynn was simply not paying attention and did not see Heinssen until it was too late. Thus, whether Heinssen came to an abrupt stop or a gradual stop is of no consequence. Given that Heinssen was stopped in front of Flynn, Flynn was responsible for operating her vehicle in a manner that allowed her to stop her vehicle or turn it aside without colliding with Heinssen's vehicle. See *Kissinger v. United Parcel Serv.*, 8 Neb. App. 260, 263, 592 N.W.2d 169, 171 (1999) ("[n]egligence generally arises as a matter of law if one operates a motor vehicle on a public street or highway and, on account of the manner of operation, is unable to stop her or

his vehicle or turn it aside without colliding with an object or obstruction on the street or highway within the operator's range of vision"). Thus, assuming Heinssen came to an abrupt stop, such action was not a proximate cause of the accident.

Likewise, assuming Heinssen's vehicle was positioned over the centerline, there is no evidence that this was a proximate cause of the accident. Had Heinssen's vehicle not been over the centerline, Flynn would still have rear-ended Heinssen and the accident would have occurred in the same manner. Thus, we conclude that the trial court did not err in granting Heinssen's motion for directed verdict and the appellants' second assignment of error is without merit.

## CONCLUSION

We conclude that the trial court erred in failing to give the appellants' proposed jury instruction regarding preexisting conditions. We further conclude that the trial court did not err in granting Heinssen's motion for directed verdict at trial. Accordingly, we reverse, and remand for a new trial on the issue of damages, and affirm the portion of the trial court's judgment granting a directed verdict in favor of Heinssen.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR A NEW TRIAL ON
THE ISSUE OF DAMAGES.